at all, the defendant's at the lead. Arguing on behalf of the plaintiff's appellant, Mr. John J. Giotomo. Arguing on behalf of the defendant's at the lead, Mr. Ted A. Giotomo. Mr. Giotomo, on behalf of the appellant, you may proceed. Please, the court, counsel. My name is John Giotomo and I represent the appellant, Moves Dance Studio, Inc, in this matter. Our appeal presents two principal issues for review. The first concerns the trial court's denial of our motion to disqualify attorney Ted Donner as counsel for the defendants. And the second principal issue is the trial court's order granting summary judgment for the defendants on all counts. With respect to the first issue, the denial of our motion to disqualify counsel, of course, the analysis begins with Rule 1.9 of the Illinois Rules of Professional Conduct. Rule 1.9 precludes an attorney from where the two matters are substantially related. Where's the relationship? I'm sorry? Where's the substantial relationship with respect to the scope of this suit versus a trademark? Correct, Judge. Fifteen years ago? Yes, Judge. Under the Shorts v. Cataloni Illinois Supreme Court decision in 1997, that analysis requires a three-prong inquiry. Correct. The first asks, requires the trial court to do a factual reconstruction of the prior matter. The second prong of that analysis asks the court whether it is reasonable to infer that an attorney representing a client in that former matter would have been privy to confidential information. Those are the elements. You're correct. But there's also the issue of what was the subject matter of the previous litigation. As I understand it, 2006 was a trademark infringement case against Jennifer Lopez. This case involves allegations of defendants' misappropriation of plaintiff-select's trade secrets and misappropriations of the student list and database. That's correct. So where's the connection in the cases at all? How is the subject matter remotely related? The connection, Your Honor, is looking at the issues presented in the current matter. In the prior matter, it was a trademark action, as Your Honor points out. The principal focus, principal issue in a trademark action involves the goodwill of the party claiming trademark protection. And we point out when we cited cases in our opening brief, Your Honor, that client lists are synonymous with the goodwill of the business. We cited the Sojack Miller case. It's out of Middle District of Florida, where the court said, quote, common sense dictates that customer lists generally are the very essence of goodwill and have been construed as such by several courts, end quote. Well, let me ask you this. In order to protect the trademark, did Donner have to know anything about the student list? Well, that's a good question, Judge, because we don't need to get to that The question is whether it's reasonable to infer that an attorney representing a client in such matter would have been privy to such information. And I direct the court to the allegations made by Attorney Donner in the complaint in that trademark action, where he alleges the goodwill of the business is a substantial importance to the company. It's one of its most important assets. And based on that allegation, those allegations alone, I would submit that an attorney making that allegation would have necessarily made, assuming it was well-grounded in fact, and I have no reason to doubt that, the attorney would have necessarily asked questions and learned information about the other assets of the business. You're saying it can be inferred, but obviously you'd have to acknowledge that ostensibly the subject matters were different in the two pieces of litigation. Well, I guess it would be fair to say that in our case, we're talking intellectual property, trademark, and in our case, we're talking a trade secret. That's also intellectual property. So I would say the issues overlap. There's substantial overlap between the issues, particularly when you look at the cases we've cited, where client lists are deemed part of the goodwill of the business. So the fact that he knew that there was a client list, first of all, the client list, I would, that is an observation that the trial court made, but as we pointed out, I don't believe that's supported by the record. And I'm looking for the specific citation of the record, but if you look at the affidavit of Kim Farah, who was the prior owner of the business, in her affidavit, she says that the client list, she compiled it over the course of several years, beginning in 1987. So our position is, it was in fact in existence at the time that the citation was, and I don't. So the fact that Mr. Donner knew there was a client list back then, and he knows there's a client list now, what a shocker, a place that has a bunch of students has a list of the students. I mean, what leg up is that giving him in his representation of these clients? It gives him a leg up, Your Honor, because, again, it's part of the intellectual property of the business. And when I appeared for a motion for a TRO, and Attorney Donner stands up, and he is fully informed and aware of the background of this company, its assets, its prior litigation history, its trademarks, and its client list, it puts me and my client, the new owner of the business, at a distinct disadvantage. And I would argue that is one of the And I would add, and the cases recognize this, it's also to promote public confidence in the legal system. And I will tell you, anecdotally, my client was shocked when we went into court with our complaint and our motion for TRO, and it was Attorney Donner who had formally represented the company she just bought representing the defendants in this matter. Well, that would be understandable, because it's sort of counterintuitive to think that somebody could remain in the case when they used to represent you on the other side, but in other words, that you've been appreciating certain rules of law that have to be followed. So when we are asked to reverse or overturn the trial court's decision, our standard of review is abuse of discretion, right? No, Judge. These are legal issues. The very first issue, whether the court applied the correct standard to determine, first, whether my client, the plaintiff in this lawsuit, is properly deemed to be. I understand all that, but I think you're getting off on a tangent here. A trial court's decision to grant a motion to disqualify an attorney will not be disturbed absent an abuse of discretion. That's the Schwartz case, 177 Illinois 2nd, 176 the Illinois Supreme Court. That's what you have to convince us, that the trial court abused its discretion. No reasonable person would agree with the ruling. We need to pin that down. Well, the trial court clearly did abuse its discretion. But is that the standard, abuse of discretion? I would argue that is the standard that applies to the court's ultimate decision whether to disqualify counsel. However, in this case, we have preliminary legal issues, at least two preliminary legal issues before you can get to the question of whether the ultimate decision was an abuse of discretion. These two preliminary legal questions are whether the trial court applied the correct standard when assessing a substantial relationship between the two parties. And again, as we've quoted in our opening brief, the trial court refused to apply and rejected the second prong of the substantial relationship test articulated in Schwartz v. Corbelow. But isn't a substantial relationship, isn't that a factual question? It ultimately is a factual question, I would agree, Your Honor. But again, we don't even need to get to that issue, whether the trial court abused its discretion in making that factual determination, because the trial court did not apply the correct standard. And I think unless and until you apply the correct standard, you never get to the question of whether it was an abuse of discretion. So in essence, you're saying the trial court's ruling was erroneous as a matter of law because it applied the incorrect legal standard. Is that what you're saying? I think, yes, we absolutely make that argument. But then to the extent the court were to consider whether that determination was an abuse of discretion on the substantial relationship issue, again, we point out I don't believe the court made proper factual findings. There was two sentences from the ruling. We've quoted that in our opening brief, I believe, and we argue and we've got cases cited to support that position. The trial court must provide a sufficient factual basis for the court to review its decision and determine whether it was an abuse of discretion. Just a suggestion, you probably don't want to spend all of your time on the disqualification issue. Very good. Second principle issue is the trial court's grant of summary judgment on all claims. The trial court's rationale for the ruling was simply its finding that numerous, or many I believe was the word used by the trial court, people have access to this client list that's issued in the case. And we have submitted to the court on pages 33 through 34 of the opening brief, and then also on page 8 of the reply brief, numerous cases that recognize that simply allowing employees or agents access to trade secret material does not destroy the trade secret quality of the data. It's obviously necessary in large corporations that numerous people have access to that information. In this case, the employees were subject to the confidentiality obligations imposed under the employee handbook. Is that clear? Is that really a clear statement of what was expected of them? I believe it protected all student information, which obviously would include anything in the client list that pertained to students. And I believe it did put them on notice of their confidentiality The only cases I believe that are cited are those involving the breadth or scope of provisions in a post-employment non-compete agreement, which the court knows those provisions are strictly because they potentially restrict an employee's ability to earn a livelihood. Here we're talking about simply putting them on notice of their confidentiality obligations. I think the employee handbook does just that. Do the defendants all sign it? Because that's not in dispute. Do they sign it? Not in dispute. And I would add, as we point out in our brief, counsel decided no case finding a provision like that, specifically a provision in an employee handbook advising employees of their obligations. There's been no case cited where that language has been found ineffective or overbroad. I mean, isn't it incumbent upon your client to put into place reasonable efforts to maintain the secrecy of that information? I believe that's correct. How did the Midell deposition erode that? I don't believe it did at all. And again, we point out, I believe the trial court was evaluating the credibility of a witness by focusing on that testimony in connection with its ruling, which of course the trial court may not do at summary judgment. We point out in the brief, the trial court simply determines whether an issue of fact exists. The trial court is not to evaluate credibility, weigh the evidence, nor does the appellate court do that in its review. I thought the trial court was saying that none of the deponents could identify what the actual secrets were. I believe that's the case. That's different than weighing the credibility. I mean, you would agree with that, correct? I believe that the trial court misconstrued the deposition testimony. And moreover, as we point out in our brief, the complaint, the amended complaint and two affidavits identify the trade secret material in explicit detail. And that was on file and before the court long before any depositions were taken in this case. So I think to the extent the trial court was focusing on, you know, a comment here or a comment there in a deposition of a witness who had never been deposed before, perhaps wasn't as sophisticated as some other deponents. I believe that, frankly, you know, trails over into evaluating the credibility of a witness. And to your point, Your Honor, it's our position that there was adequate security measures put in place. We've talked about the employee handbook and the acknowledgment signed by each one of the employees with respect to the news client list. It is password protected. There's a unique login assigned to each employee. I would also add that employees were not all given the same level of access. Access was provided on a need-to-know basis. In other words, certain employees were given certain level of access. Others that may have needed greater access were given greater access. I would further add this Jackrabbit database system allows the subscriber to create a list, which is what we did in this case, to track the user activity of any of the users of the Jackrabbit database. Was substantially the same information that you talk about that was on these lists and that published to the public in things such as recital programs and T-shirts? No, Your Honor. And I believe that was another misconception perhaps at the trial court level. To be clear, our position is not that a student name or an email address is confidential or is a trade secret. Our position is and has always been throughout this case that it is the compilation of that information in addition to other unique information pertaining to that student such as the dance training history, the age, certain preferences or requirements of the student in combination with all the other identifying information. That is what's been pulled together over the course of 25 or more years by my client. So you're saying it's a totality of the considerations, not cherry picking certain items? Correct. Mr. Dino, your time has expired on direct. You'll have an opportunity to address the Court in rebuttal. Thank you. Thank you. All right. Mr. Dowd, on behalf of the College, you may proceed. Good morning, Your Honor. Counsel, my name is Ted Downer. I represent the at-the-lease, the defendants in this case. Your Honor, the first issue that counsel addressed was this question of whether the Court erred in denying a motion to disqualify at the outset of this case. But you're in sort of the unusual position of defending yourself, right? Ironically, Your Honor, this is the second time this year I've been before this Court, and it's the second time this year I'm defending myself before this Court. But it is, I think, a position that is certainly defensible. The fact is, and the only thing that I really want to make sure that I've pointed out to this Court that's not necessarily in the briefs, I don't know if it's specifically there, is that I do have an obligation under 1.9, and I think I complied with it. When counsel raised the issue of whether my representation of the predecessor company, not the company that he has represented, but a predecessor company in a case involving a trade secret action against MTV and Jennifer Lopez, created this somehow conflict for me to be representing the defendants in this case, the two things that I thought were important to emphasize to the Court were, first, that this was not the only instance, and I think I had an obligation to dispose and did, the only instance in which I had ever represented the prior entity. I gave the Court an item-by-item list of every hour I'd ever billed for that entity on any issue, and I pointed out to them the stuff that I had never done any work for them on, specifically because since the moment Donner & Company Law Offices, my firm, came into existence, the very first moment after my company was incorporated, a company called Organized Noise, which was the predecessor to Sol Unique, was incorporated by me. My very first client as an independent lawyer was the defendants in this case. I have been representing them since the outset of their business, since the outset of my business. I did some work for the company for which they worked in matters completely unrelated to them, specifically because I had an obligation of loyalty to them. I believe I've honored my ethical obligations in this case, and unless there are questions on the issue, John? If the trial court applied an incorrect standard in this matter? Not at all, Your Honor. As has been pointed out, this is an abuse of discretion standard with respect to whether there is evidence from which a reasonable inference can be drawn. And the Court was looking for... But if the trial court applied an incorrect legal standard, then either the trial court is abusing its discretion by applying an incorrect legal standard or we review it de novo to determine what the correct legal standard is. Would you agree with that or no? You would de novo consider what the legal standard would be, and then the question becomes whether the court acted with it in its discretion under that standard. There's been nothing shown in this proceeding to demonstrate that, even assuming that Judge Wiegand had somehow misconstrued the rules that she was supposed to follow, that she shouldn't have reached the same result anyway or couldn't have reached the same result anyway. In affirming an issue of discretion, this Court generally looks to whether there is any grounds in the record to support the trial court's decision. It's a very deferential standard. Exactly. You're correct about that. But let me ask you this. The counsel alluded to this. If somebody asked you, is there a connection between the legal work in the prior litigation, the trademark, and this litigation, your answer seemingly would be no. So tell us succinctly and specifically why there is no connection between the prior litigation and this litigation that would cause a conflict of interest. The factual affidavit that I presented to the Court, Your Honor, the only factual evidence that was presented to the Court on this issue whatsoever, there was nothing presented from anybody on the other side, was to that effect. And it was specifically to say that in suing Jennifer Lopez and in suing MTV, we were dealing with a publicly visible mark and the value that a publicly visible mark has. A trademark and a trade secret are inherently, they're both intellectual properties, but they are absolutely at opposite ends of the spectrum in intellectual properties. One deals with secrets and the other deals with publicity, that which is visible to the world and that which is supposedly visible to no one. Nothing about trade secrets had anything to do with Jennifer Lopez whatsoever and wouldn't have ever come into that case. There would have been no reason to talk about things that defendant didn't know. The things we were talking about was that which was registered with the Patent and Trademarks Office. And more importantly to that point, Your Honor, the fact remains that the reason this case came into being, presumably, if there were any, quote, unquote, trade secrets at all, was because my clients in this case knew about those trade secrets. The people that I'm representing in this case are accused of knowing things that they somehow misused. There's no suggestion that anything that I learned working for Moves 15 years ago, for a prior entity in a prior unrelated case, gave me insight that my clients didn't already have. There's no leg up that I get on any level in that context. If anything, I could have walked into this case as a complete stranger and if there were really trade secrets to be had, learned them from my clients for the first time, but still in a way that would have supposedly mattered in the context of this case. The concept of 1.9 disqualification and the idea that when you are representing a prior, a new litigant against a prior client, is that you've somehow gotten advantage from things you learned confidentially from that prior client that would give you an advantage that you shouldn't be able to use against them. So, for example, if I had been involved in Moves, the prior entity, in the construction of, let's say, their manuals with respect to what is or isn't supposed to be kept confidential, or what is or isn't supposed to be a trade secret, and I knew what went into that writing, and I knew what they were trying to protect in that writing, we're getting to a point where I'm now arguing over my own work product, essentially, in a lawsuit, in which I'm saying, well, that's ambiguous. If it's something that I wrote, that certainly is a conflict. That's a direct conflict in a related matter that involves a prior client. This is no such thing. Mr. Donner, counsel raised that here's the law, but the more global or umbrella under which this exists is public confidence in the legal system. How do you respond to that? It's very important to me, Your Honor, and that's one of the reasons why I emphasize, for the purposes of disclosure, that I had done a couple other things for this entity besides just this Jennifer Lopez case, and I wanted to make sure that everything before Judge Whedon was above board. I think the important thing to recognize, first of all, is that the client that Mr. Dittomo is representing in this litigation is a client that is a complete stranger to me. I have never met any of these people. I have never dealt with that entity. That entity did not even exist during the period of time that I had been involved with an entity known as Moves Dance, Moves Fitness and Dance, I think was the full name, or something like that. And it is not about my coming in against a former client on any level, just starting there. The second thing, though, in terms of public confidence is that I think the public confidence is addressed by the fact that we do look closely at this stuff. Judge Whedon had a complete record in front of her. You're saying you gave Judge Whedon more than she asked for. You gave her not only what you did in the prior litigation but all litigation. My belief was and remains that the trial court judge should be able to look at that record with open eyes and be able to evaluate clearly whether there is any potential conflict because I have to recognize there is a possibility that I may miss the boat on that. And so better that I put it in front of her than for me to evaluate myself in advance, oh, there's nothing to worry about, and hide the ball. I think I was open and upfront about this. I think the trial court reasonably reviewed the record, and I think the record was really very clear. There is nothing about the Moves logo that has anything to do with this case. Can I shift gears and ask you whether this handbook and the passages quoted from the handbook put the defendants on notice that this information was confidential, specifically, I guess, the client lists? The way that I'm tempted to answer that question, Your Honor, does kind of bite into the idea that there could be some kind of a question of fact on it. The problem is that you can look at the thing. The language that's in this handbook about client confidential information, specifically about kids, and when you read it, it's not necessarily something that you can read as having anything to do with the business of the company so much as it is what we had to do in this case. When the complaint was first filed in this case, my side went before Judge Wheaton and said, Your Honor, there's a lot of confidential information about these children in the exhibits to the complaint. They put scholarships. They put Social Security numbers. None of that material had been redacted in what was filed with the court, let alone the kids' names. We asked that that stuff be put under seal and that the complaint be refiled because we do have in this court, just as this dance studio and the other dance studio has an obligation to keep some things kept as confidential with respect to children's identities and children's information. That's a much different thing than the idea that you are protecting information from disclosure that will give somebody a marketing advantage. And I don't know that you can read this handbook as clearly establishing that there's some kind of a marketing advantage at issue in that confidential information provision. To the contrary, there's an entirely separate provision in the handbook that defines trade secrets. And in that provision where trade secrets are specifically defined, there is no reference whatsoever to the idea of lists of kids, their addresses or contact information, their dance histories, which are the things that are claimed in this case to be the confidential information about these kids. The other thing, Your Honor, about it that makes it difficult to say where that would begin or end is that ambiguity question that you were talking about with the opposing counsel earlier. The Eichmann case is an example of Lake County and this court of an instance in which the non-compete afterward dealt with the question of what's clear about clients and what's not clear about clients. Who is it that's being protected here and what information is being protected here? When you're looking at those issues and you're trying to decide what is or is not a trade secret, what is it or is not susceptible to being protected post-employment or otherwise, I don't think that narrowly construing a non-compete redefines what is ambiguous. The question of what is ambiguous begins and ends with what would an employee understand to be their obligations in a given circumstance. The big difference between this case and Eichmann and its progeny and Hackney and all the other non-compete cases is that in this case the plaintiff had a leg up on everyone in those cases. The client who has a non-compete agreement who two years later goes to work for a competitor and discloses information that they were contractually obliged not to do is off on their own someplace where the employer hasn't seen them for two years. In this case, if this employer wanted stuff that was supposedly theirs to be returned to them, they simply had to ask for it. There was a letter that went out to these folks in I think it was April or May of 2015 saying, you'd be careful about what you do with documents and what you do with customers because you've got some obligations out there. And it's a very unclear letter about what they're supposed to do or not do. And then there is a circumstance where one of the employees is invited back and asked to provide information that she has with respect to what's called the outreach program. But other than that, and particularly given that, it is a wonder to me that we ended up in a lawsuit in July of 2015 when at the end of May of 2015, if the lawyer should have actually already been hired and said, have them come in and just give us everything, here's the list of what we want you to provide, that in theory could have taken care of any concern that they had. As I'm looking at the quotes from the employment manual, doesn't it provide you must return all such information to Tanisha or Carol when you leave the employee at the company and may not keep, make or keep any copies of the confidential information? Didn't it require them to return it? Well, that's the question is return what, Your Honor? You can't return the names from the program. The program shows every class that the kids take. You can't return that. You can't return your Facebook contacts. You can't return the mother's phone number that was given to you and every other mother. You can't return the e-mails that are in your database someplace on your own personal e-mail that was the only e-mail they used for some odd years that have come to you from parents along with a hundred other parents whose e-mail addresses are there. What specifically is being asked to be returned is never identified. What about this phrase in the manual? You must treat all information received from or concerning students and all proprietary business information of the company as confidential. Do not use confidential information for any purpose other than to serve our students and furtherance of the company's business. So what would you make of that? There's two halves to that. The first half is the information relating to the children, and the other is the proprietary business information. Proprietary business information is dealt with later in the context of trade secret definitions. I would submit, Your Honor, that other than the claim in the Second Amendment, and the First Amendment complaint not in the original, that somehow an IDANS budget is somehow at issue in this case. And I can address that if the Court wants me to. But to your specific question, there's not really a clear line as to what it is that's at issue with respect to the information relating to children. As I said, the way that I read that the first time through, that relates to the idea that if you know a kid's medical needs, you're not supposed to disclose that to the public. If you've got stuff that they gave you that was confidential, you give that back. What is confidential about the kid would be, in theory, known when it's given to you. There would be some definition. This is supposed to be kept confidential. Got it. We will. The basic example, Your Honor, that I would give that's easiest to know is the confidential nature of a kid that's on scholarship, whose financial needs are such that they can't afford to get through the program. That kind of information wasn't so public, wasn't so private to them that they excluded even from the complaint that was filed with this Court. Let me finish this thought. Well, a lot of the, some of the things we're talking about on the list, which may appear in programs and on T-shirts and things like that, who are the clients and what classes have those clients been taking. What about this budget, which apparently was never published anywhere in a program, I take it? The I-DANCE materials, Your Honor, as they're referred to generically, included the identity of the I-DANCE students, their contact information, and the so-called I-DANCE budget. What we pointed out in our briefs is that what was in the I-DANCE budget is only reflected in what we produced. There was never a production of any form of it to the Court, so the Court could say, well, that's certainly confidential on any level. What it is and what it was described as being for depositions is what the dance teacher who was in charge of the program's day-to-day management had to do to make sure that dance costumes were paid for, that pizza was paid for, and that the kids knew what they had to spend to go to a specific event. So if there's a competition at the Paramount Theater and the total cost for a team to compete is $300 and there's 10 kids, it's $30 a kid. This is commonly known stuff. As we pointed out in the record, as we pointed out in the depositions, as we pointed it out in the summary judgments, these are teachers that have been doing this since 20 years ago. They know how to do budgets. It's not like there's some sacrosanct information or some secret keys to the kingdom in the idea of putting together a budget for how much pizza you're going to give to a given kid at a party. So there was nothing there that was treated as secret. Again, too, if you look at the trade secret definition in the handbook, never stated there. If you look at the confidential information provision in the handbook, nothing there about it. In fact, there is no record whatsoever, and the complaint that he's referring to was not verified. The first complaint was verified, the one that introduces the PsyDance budget, suddenly verified pleadings drop off the planet. We have no sworn testimony from anybody on their side to show any communication whatsoever with respect to that supposed trade secret and what was supposed to be done with it. No indication that anybody was ever told, you're not allowed to talk about the budget. It's a secret. So why my clients are being held to a standard where they have to defend themselves in a lawsuit over something that they were never told, you're not allowed to talk about this, is the big question in their mind. Thank you very much. Thank you very much, Your Honor. The attorney will be admitted to the court in rebuttal. Thank you. Justice Burke, with respect to your question a moment ago concerning the PsyDance budget and counsel's reference to it being commonly known stuff, it wasn't commonly known stuff. And we know that because there's e-mails from the defendants in this case acknowledging that it's going to be of value to them in their new business. And it's in the record at C2154 where Defendant Klug states, quote, you know, just in case we ever needed the info, wink, wink, end quote. So clearly it was not commonly known stuff. It didn't simply pertain to the cost of a pizza. It was a valuable budget. Where is the copy of the written budget in the record? Judge, because it was confidential information, I'm not sure it was included, but you have it. Wait, wait, wait. I mean, you did include in the original complaint, according to the opposing counsel, the children's Social Security numbers and children's names and things of that nature, but you didn't include a copy of the budget? The children's names was a mistake on my part, and it was redacted immediately when it was brought to my attention the first day we were in court. So that was not an intentional. But you didn't submit this even under seal or ask it to be impounded? There are specific allegations in the complaint identifying exactly what the IDAN's budget consisted of. It included tuition charges. I appreciate that, but shouldn't the trial court have had the original document, not simply your recitation of what's in it? Judge, I would submit that the trial court granted summary judgment having nothing to do with the content of the IDAN's budget. So it's irrelevant to our decision? I would say it's irrelevant. I would take the court's suggestion, and maybe we will do that, assuming the case is remanded. But for purposes of court's review of the issues, I don't believe it's determinative. Okay. Also, just quickly, I believe Your Honors mentioned the standard of review again, and I would point out it's in the brief. But, again, we're talking about the construction of the rules of professional conduct, specifically the former client issue, the substantially related issue. The construction of that rule is an issue of law. Again, we've cited the cases. So, again, that's de novo review. And I would point out, again, it's in the brief, but point made earlier about the relationship between the trademark litigation and the subsequent trade secret litigation, I would direct the court to the Thermodyne decision, which was a decision from the Federal District Court, Northern District of Illinois. That was the case where Winston & Strong was disqualified from representing a client in a subsequent matter. The first matter was a breach of contract action. The second matter was a trade secret action brought by the client against McDonald's. And on its surface, I think we would all agree these are completely dissimilar cases. But in that case, the court found Winston & Strong, that it had represented the client in the first breach of contract action, defended that client. One of the allegations was in the breach of contract action that the plaintiff was entitled to an equity interest in the client. And so what the court said later when Winston & Strong wanted to appear representing McDonald's adverse to the client in a trade secret action, the court said, well, wait a minute. When you settled that action, Winston & Strong, to the extent there was an allegation, a claim made that the plaintiff was entitled to an equity interest in the corporation, certainly you would have assessed the value of the company, assessed the assets of the company, if you were doing your job and settling that action, that breach of contract action, again, which alleged they were, the plaintiff was entitled to an equity interest. So, breach of contract action over here, and then there's a trade secret action filed against McDonald's by the same client, and Winston & Strong wants to appear on behalf of McDonald's adverse to the client. And what the court said is, no, based on that allegation in your work in the first matter, if you were properly representing your client, and given that allegation that the plaintiff was entitled to an equity interest, you would have necessarily inquired into the assets of the business, the value of those assets. And so when you're later talking about the trade secret action, that would have necessarily, it was reasonable to infer you also learned information about the trade secret. But isn't that a factual determination? It was a factual determination in the Federal case. It would have been a factual determination here, and we must review that based on an abuse of discretion. I believe, as I mentioned earlier, Judge, ultimately it is a factual determination. But the trial court abused its discretion by applying the incorrect standard. And we've cited at least two cases in the opening brief for that one. Anything further to wrap up? I don't believe so. Thank you very much. Thank you. All right. I'd like to thank both counsel for the quality of their arguments here this morning. The matter will, of course, be taken under advisement, and a written decision for all parties to review will be filed in due course. We will stand adjourned.